# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| VICKI V. BUSBY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.:  2:04-CV-2799-VEH** |
| | ) | |
| JRHBW REALTY, INC. d/b/a | ) | |
| REALTYSOUTH, | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM OPINION

## I.      Introduction

Pending before the court are the following motions:  (1) Defendant JRHBW

Realty, Inc. d/b/a RealtySouth's ("RealtySouth") Motion for Reconsideration of

Order Excluding Expert (Doc. 127) ("Second Reconsideration Motion") filed on

December 4, 2008; (2) Plaintiff Vicki V. Busby's ("Busby") Motion for Partial

Summary Judgment (Doc. 132) ("Partial Motion") filed on December 10, 2008; (3)

RealtySouth's Cross-Motion for Summary Judgment (Doc. 147) ("Cross-Motion")

filed on January 13, 2009; and (4) Busby's Motion to Strike Declaration of Stephen

H. Murray ("Murray") (Doc. 153) ("Strike Motion") filed on February 24, 2009.

All motions have been fully briefed by the parties and are ripe for

determination.[1]  Having considered the entire record, including the arguments of the parties (and the authorities cited by them), the court's prior order denying class certification (Doc. 76), the Eleventh Circuit's mandate in this case, *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1320 (11th Cir. 2008) (Doc. 92), the court's post-mandate order granting class certification (Doc. 93) and subsequent order and opinion reaffirming that ruling on reconsideration (Docs. 101-02), and the order (Doc. 124) granting Busby's Motion to Preclude Certain Testimony by Proffered RealtySouth Expert (Doc. 111) ("Motion to Preclude"), the court is of the opinion that the Second Reconsideration Motion is due to be denied.[2]  Alternatively, the Second Reconsideration Motion is due to be granted in part (in that the court has reconsidered its order) and otherwise is due to be denied (because the court declines to withdraw its order precluding Murray from testifying as requested by RealtySouth).[3]

Relatedly, Busby's Partial Motion is due to be granted, and RealtySouth's Cross-Motion is due to be denied.  Finally, Busby's Strike Motion is due to be termed as moot.

---

[1]  (*See* Docs. 128, 130, 133-37, 140, 144-45, 148, 151-52, 156-57).

[2]  The court assumes the reader's familiarity with its prior orders entered in this case and therefore does not restate here the factual recitals, legal standards, and analyses set out therein.

[3]  The court further notes that RealtySouth also seeks a hearing on reconsideration.  This request is due to be denied because, as the issues are straightforward, the court, in its discretion, sees no benefit to holding a hearing.

## II.      Second Reconsideration Motion

RealtySouth seeks reconsideration of the court's order (Doc. 124) precluding Murray from testifying as an expert for it.  In sum, RealtySouth states that the court's order was wrong because it misconstrues the scope of the mandate and whether RealtySouth has available to it an array of services defense under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617.  Busby's response (Doc. 130) focuses upon RealtySouth's failure to meet the heavy burden on reconsideration.

### A.      Standard Applicable to Motions to Reconsider

In the interests of finality and conservation of scarce judicial resources, reconsideration of an order is an extraordinary remedy and is employed sparingly. *See United States v. Bailey*, 288 F. Supp. 2d 1261, 1267 (M.D. Fla. 2003); *Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F. Supp. 522, 524 (E.D. Pa. 1992); *Spellman v. Haley*, No. 97-T-640-N, 2004, WL 866837, at *2 (M.D. Ala. Feb. 22, 2002) ("[L]itigants should not use motions to reconsider as a knee-jerk reaction to an adverse ruling.") (citation omitted).  Indeed,  as a general rule, "[a] motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice."  *Summit Med. Ctr. of Ala., Inc. v. Riley*,

3

284 F. Supp. 2d 1350, 1355 (M.D. Ala. 2003).

It is well established in this circuit that "[a]dditional facts and arguments that should have been raised in the first instance are not appropriate grounds for a motion for reconsideration." *Rossi v. Troy State University*, 330 F. Supp. 2d 1240, 1249 (M.D. Ala. 2002) (denying motion to reconsider when plaintiff failed to submit evidence in question prior to entry of order and failed to show good cause why he could not have done so).[4]  Furthermore, the Eleventh Circuit has declared that "a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. U.S. Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997); *see also Russell Petroleum Corp. v. Environ Products, Inc.*, 333 F. Supp. 2d 1228, 1234 (M.D. Ala. 2004) (relying on *Mays* to deny motion to reconsider when movant advanced several new arguments); *Coppage v. U.S. Postal Service*, 129 F. Supp. 2d 1378, 1379-81 (M.D. Ga. 2001) (similar);[5] *Richards v. United States*, 67 F. Supp. 2d 1321, 1322 (M.D. Ala. 1999) (same).

Notwithstanding these limitations, reconsideration is appropriate to correct

---

[4]  Likewise, motions to reconsider are not a platform to relitigate arguments previously considered, but unaccepted. *See Lazo v. Washington Mutual Bank*, 10 Fed. Appx. 553, 553 (9th Cir. 2001) (motion to reconsider is properly denied where movant merely reiterates meritless arguments); *American Marietta Corp. v. Essroc Cement Corp.*, 59 Fed. Appx. 668 (6th Cir. 2003) (similar).

[5]  This discussion is lifted almost verbatim from Judge Steele's opinion in *Gougler v. Sirius Products, Inc.*, 370 F. Supp. 2d 1185, 1189 (S.D. Ala. 2005).

manifest errors of law or fact.  *See* Fed. R. Civ. P. 60(b); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."); *Summit*, 284 F. Supp. 2d at 1355 ("A motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice.").  The grant or denial of a motion to reconsider is left to the discretion of the district court.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1023-24 (11th Cir. 2000).

### B.    Analysis

After giving RealtySouth's Second Reconsideration Motion in-depth consideration, the court has determined that there exists no adequate ground for it to reconsider its prior order precluding Murray from testifying.  All of RealtySouth's arguments were made and were declined by the court during initial briefing on Busby's Motion to Preclude.  Further, the record does not demonstrate any need for this court to correct clear error or rectify manifest injustice.

While at first blush RealtySouth appears to have made some persuasive points, it has cherry-picked certain issues addressed in the opinion by focusing on the court's discussion of the array of services defense (most of which appears in n.4 of Doc. 124)

and law of the case considerations.  For example, RealtySouth has not even mentioned the bases[6] of irrelevancy and lack of helpfulness to the jury for granting the motion to preclude.  (Doc. 124 at 122-23).  <u>To be clear, these two bases provide</u> <u>independent reasons for excluding Murray's testimony separate and apart from any</u> <u>array of services defense and law of the case doctrine that the court addressed in the</u> <u>initial opinion</u>.

The class certification opinion from the Eleventh Circuit makes it clear that the scope of RealtySouth's defense is limited to proof that  services were, in fact, provided "in exchange for" the ABC Fee.[7]  Further, and beyond any application of the law of the case doctrine, pre-*Busby* law establishes that <u>§ 8(b) requires the</u> <u>performance of actual services</u>.  *See, e.g., Sosa v. Chase Manhattan Mortg. Corp.*, 348 F.3d 979, 981 (11th Cir. 2003) ("Subsection 8(b) attempts to close any loopholes by prohibiting any person from giving or accepting any part of a fee <u>unless services</u> <u>were actually performed</u>.") (emphasis added).

The anticipated expert testimony from Murray amounts to a justification of or an explanation of RealtySouth's motivation for charging the ABC Fee; the testimony does nothing to make it "more probable or less probable" that any actual services

---

[6]  Cited by this court in the <u>body</u> of its opinion.

[7]  ABC Fee stands for the administrative brokerage commission charged by RealtySouth in the amount of $149.00.  (Doc. 148 at Dodge Aff. ¶¶ 4-6).

were provided or "actually performed[,]"  *Sosa*, 348 F.3d at 981, in exchange for the ABC Fee "than it would be without the evidence."  Fed. R. Evid. 401.  Accordingly, Murray's testimony is entirely irrelevant to the "simple binary determination" of whether RealtySouth provided or "actually performed" "any services" or "no services[,]" *Busby*, 513 F.3d at 1324, to or for Busby "in exchange for" the ABC Fee.

Relatedly, RealtySouth, as the proponent of Murray, has failed to meet its substantial burden under Rule 702 of demonstrating that his "testimony [will] assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1107 (11th Cir. 2005) (citations omitted); *see also* Fed. R. Evid. 702.  In fact, the court firmly believes that if Murray were permitted to testify, his testimony would have the exact opposite effect—it would unnecessarily confuse the jury because RealtySouth's reasoning behind or motivation for charging the ABC Fee is irrelevant to the issue of its § 8(b) liability and is not even "a fact in issue."

In sum, <u>Murray's testimony as an expert is irrelevant and/or unhelpful to the jury's factual determination of whether an array of services (or any particular service) was provided by RealtySouth because the anticipated expert testimony amounts to a financial justification/explanation behind charging the ABC Fee</u>, not any proof that

the fee was earned.  Accordingly, the grounds asserted by Busby in her Motion to Preclude Murray from testifying on behalf of RealtySouth are well-taken from a merits standpoint, <u>regardless of any analyses relating to RealtySouth's array of services defense and the law of the case doctrine</u>.

It is clear that RealtySouth has not asserted that its Second Reconsideration Motion is supported by any intervening change in controlling law or any newly discovered evidence that would alter the result of the court's prior order precluding Murray from testifying.  Basically, RealtySouth is unhappy with this court's evidentiary conclusion and perhaps with this court's failure to give an even more detailed analysis explaining its decision.  (*See also* Doc. 101 at 8).  As this court has stated before on reconsideration in this particular case, "[c]ertainly, a party's unhappiness with a court's order—whether it be to the holding of that order or the manner in which the holding was announced—does not meet the standard for reconsideration."  (*Id.* at 9).

As this court and numerous other courts have held, a motion for reconsideration premised on previously rejected arguments should be denied because it "does not meet the standard employed on review of a Motion for Reconsideration." *Rueter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 440 F. Supp. 2d 1256, 1268 (N.D. Ala. 2006).  "[M]otions to reconsider are not a platform to relitigate arguments

previously considered and rejected." *Rueter*, 440 F. Supp. 2d at 1268 n.9 (citations omitted); *see also Reich v. Compton*, 834 F. Supp. 753, 755 (E.D. Pa. 1993) ("[A]ny litigant considering bringing a motion to reconsider based upon . . . [clear error and manifest injustice] should evaluate whether what may seem to be clear error of law is in fact simply a disagreement between the Court and the litigant."), *judgment affirmed in part and reversed in part on other grounds*, 57 F.3d 270 (3d Cir. 1995). Accordingly, for all these reasons, RealtySouth's Second Reconsideration Motion is due to be denied, and the court confirms its prior order precluding Murray from testifying on behalf of RealtySouth <u>as further clarified herein</u>.

## III.  Partial Motion and Cross-Motion

### A.  Summary Judgment Standard

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). "The substantive law applicable to the case determines which facts are material." *Fitzpatrick*, 2 F.3d at 1115 (citation omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

### B.    Statement of Material Facts

As testified to by C. Tyler Dodge,  Senior Vice President and Chief Operating Officer for RealtySouth, the ABC Fee "is simply an increase in the price or fee that RealtySouth charges for all its brokerage services rendered to most buyers and sellers." (Doc. 144 at Ex. A (Dodge Aff.) ¶ 5(emphasis added)). The ABC Fee is "not intended to cover a specific service (for example, a flat fee for record storage or for attendance at the closing), it covers a whole variety of services provided to both buyers and sellers and helps defray significant increases in overhead that RealtySouth

had incurred for many years and continues to incur." (*Id.* (emphasis added)).

Examples provided by RealtySouth of what the ABC Fee "helps [to] pay for"

include:

> RealtySouth's <u>costs</u> in complying with various regulatory requirements, providing consumers with both standard and increased services, including, among other things, <u>providing facilities, offices, equipment, a far more functional and enhanced web-site and other technological departments, greater availability of information along with a better ability to search for and access such information, and contracts and other business forms for its agents and customers,</u> just to name a few. In addition, in the Busby transaction, RealtySouth and our agent actually helped Plaintiff Busby locate and buy the house that she desired to purchase.

(*Id.* (emphasis added)).

RealtySouth explains the ABC Fee's relationship to the overall structure of the

real estate transaction:

> While the challenged fee is entitled an "administrative brokerage commission," that is merely to ensure that those costs are not split with RealtySouth's sales agents (as the percentage commission charge portion of costs are). If RealtySouth had to share the increase (i.e. the administrative brokerage commission) with its agents, the administrative brokerage commission would have to have been greater than $149, which would have lead to a greater, and in our view unnecessary, increase in costs to consumers. <u>In short, while called two different names, the percentage based commission and the administrative brokerage commission are what it collectively costs a buyer (or seller) to do business with RealtySouth,</u> and combined, those commissions constitute the compensation for all the services RealtySouth performs for the buyer (or seller), in this case Plaintiff Busby.

(*Id.* ¶ 6 (emphasis added)).

## C.    Analysis

### 1.    Section 8(b) Background

The purpose of RESPA is "to effect certain changes in the <u>settlement process</u>

for residential real estate[.]"   12 U.S.C. § 2601(b) (emphasis added).   In passing

RESPA, Congress expressly found that:

> [S]ignificant reforms in the real estate settlement process are needed to insure that <u>consumers</u> throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and <u>are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country</u>.

12 U.S.C. § 2601(a) (emphasis added); *see also Busby*, 513 F.3d at 1320 ("In 1974,

Congress passed RESPA to regulate the costs consumers pay <u>to settle</u> their real estate

transactions.") (emphasis added).

RESPA defines "settlement services" as including:

> [A]ny service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement[.]

12

12 U.S.C. § 2602(3).

This case arises under § 8(b) of RESPA, which provides:

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received <u>for the rendering of a real estate settlement service</u> in connection with a transaction involving a federally related mortgage loan <u>other than for services actually performed</u>.

12 U.S.C. § 2607(b) (emphasis added).

As construed by the Housing and Urban Development Department ("HUD") in a formal policy statement ("Statement of Policy") issued on October 18, 2001,[8] § 8(b) proscribes unearned fees in the following types of cases:

---

[8]   In *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257 (11th Cir. 2002), the Eleventh Circuit determined that HUD's Statement of Policy is due deferential treatment.  305 F.3d at 1263 ("We conclude, therefore, that the 2001 SOP is entitled to *Chevron* deference.")  (footnote omitted); *see also Culpepper v. Irwin Mortg. Corp.* (*Culpepper IV*), 491 F.3d 1260, 1269 (11th Cir. 2007) ("In *Hirsch*, <u>we reiterated that *Heimmermann* had adopted the 2001 SOP as the law of this circuit</u>; we then applied the two-step test as articulated in the 2001 SOP.") (emphasis added) (citation omitted). Without undergoing any *Chevron* analysis, *Busby* embraces HUD's Statement of Policy in its interpretation of a no services provided § 8(b) claim. 513 F.3d at 1321.  *But see Friedman v. Market Street Mortg. Corp.* ("*Friedman II*"), 520 F.3d 1289, 1297 (11th Cir. 2008) (rejecting application of HUD's Statement of Policy in evaluating validity of § 8(b) claim based upon "a fee that exceeds the reasonable value of goods, facilities, or services provided") (emphasis in original omitted); *Friedman II*, 520 F.3d at 1297 ("Because the language is clear and unambiguous, '[t]here is not enough play in the statutory joints to allow HUD to impose its own 'interpretation' under the aegis of *Chevron*.'  *Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir.2002)."); *Friedman II*, 520 F.3d at 1298 ("*Heimmermann* did not hold that we must grant *Chevron* deference to all HUD interpretations of RESPA, nor did *Heimmermann* speak to the issue of excessive fees or subsection 8(b).") (citation omitted).  To the extent that *Friedman II*'s lack of deference given to HUD's Statement of Policy regarding § 8(b) claims of unreasonable charges is inconsistent with the Eleventh Circuit treatment of it in *Heimmermann*, *Culpepper*, *Hirsch*, and *Busby*, the prior panel decisions control this court.  Alternatively, by virtue of the *Busby* mandate, law of the case requires this court to follow HUD's Statement of Policy with respect to Busby's § 8(b) claim of no services provided.

(1) Two or more persons split a fee for settlement services, any portion of which is unearned; or (2) one settlement service provider marks-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) <u>one service provider charges the consumer a fee where no, nominal, or duplicative work is done</u>, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

Statement of Policy 2001-1 § IV, Pt. C § D, 66 Fed. Reg. 53,052, 53,059 (Oct. 18, 2001) (emphasis added); *see also* 24 C.F.R. § 3500.14(c) (current through March 27, 2009).[9]

As HUD further explained its Statement of Policy:

Section 8(b) prohibits the giving or accepting of any portion, split, or percentage of any charge other than for goods or facilities provided or services performed; <u>it is intended to eliminate unearned fees. Such fees are contrary to the Congressional finding when enacting RESPA that consumers need protection from unnecessarily high settlement charges.</u> 12 U.S.C. § 2601(a). It is HUD's position that Section 8(b) proscribes the acceptance of any portion or part of a charge other than for services

---

[9]  24 C.F.R. § 3500.14(c) states:

No split of charges except for actual services performed. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. <u>A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section.</u> The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this Part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

*Id.* (emphasis added).

actually performed. . . .  In HUD's view, <u>Section 8(b) forbids the paying or accepting of any portion or percentage of a settlement service--including up to 100%--that is unearned</u>, whether the entire charge is divided or split among more than one person or entity <u>or is retained by a single person</u>. Simply put, given that Section 8(b) proscribes unearned portions or percentages as well as splits, HUD does not regard the provision as restricting only fee splitting among settlement service providers.

Statement of Policy 2001-1 § IV, Pt. C § D, 66 Fed. Reg. at 53,059 (emphasis added).

Finally, HUD did not intend for the foregoing categories to be an exhaustive list. *Id.*

("The Secretary, therefore, interprets Section 8(b) of RESPA <u>to prohibit all unearned fees, including, but not limited to, cases where: . . . .</u>") (emphasis added).

As the Eleventh Circuit has defined the various subparts of § 8:

Section 8 of RESPA addresses kickbacks and unearned fees. Subsection 8(a) contains the general prohibition on making payments pursuant to any referral fee arrangement.  <u>Subsection 8(b) attempts to close any loopholes by prohibiting any person from giving or accepting any part of a fee unless services were actually performed.</u>  Read together, the two subsections create <u>a broad prohibition against fees that serve solely to increase the cost of settlements to consumers</u>.

*Sosa*, 348 F.3d at 981-82 (emphasis added) (footnote omitted).  The Eleventh Circuit further noted in *Sosa*:

Subsections 8(c) and 8(d) complete the prohibition on kickbacks and unearned fees:  <u>subsection 8(c) provides specific examples of the sorts of fees that are earned and not prohibited by subsections (a) and (b)</u>, while subsection 8(d) provides criminal and civil liability against persons who violate section 8. 12 U.S.C. § 2607(c), (d).

348 F.3d at 982 n.1 (emphasis added).

In addressing whether the borrowers in *Sosa* had stated a claim under § 8(b) of

RESPA, the Eleventh Circuit reasoned:

> To state a claim under the applicable part of subsection 8(b) of RESPA, the borrowers must allege that Chase "accept[ed] any portion, split or percentage of any charge . . . for the rendering of a real estate settlement service . . . other than for services actually performed." 12 U.S.C. § 2607(b).  The borrowers have not done so.
>
> The complaint alleges, and we take as true, that Chase charged borrowers $50 for courier or messenger fees, that Chase paid only a portion of that fee to third-party contractors, and that Chase "created the misimpression" that the fees were entirely paid to the third parties. The borrowers have thus contended that Chase accepted a portion of a charge for real estate services.  <u>What is missing is an allegation that the portion of the charge that Chase retained was accepted "other than for services actually performed," i.e., that Chase performed no services that would justify its retention of a portion of the fee</u>.
>
> Not only does the complaint fail to allege that Chase did not perform any services, we do not believe that the borrowers could credibly make such an allegation.  <u>It is undisputed that the charges were paid to Chase and that Chase arranged to have items delivered to complete the closing</u>.  Through its agents, therefore, Chase performed the deliveries that were the subject of the charges.  Moreover, even if Chase could not be credited with the actual delivery, <u>Chase benefitted the borrowers by arranging for third party contractors to perform the deliveries</u>.  Under these circumstances, <u>we find it impossible to say that Chase performed no services for which its retention of a portion of the fees at issue was justified</u>.

348 F.3d at 983-84 (emphasis added).  Thus, in *Sosa*, the benefit of the deliveries to

the borrowers meant that the plaintiffs could not state a claim under § 8(b), regardless

of whether Chase directly or indirectly (as the arranger through the retention of third parties) delivered the items for the real estate closing.

In the class certification mandate issued in this case, the Eleventh Circuit clarified the scope of § 8(b):

> As stated above, the 2001 SOP, addressing RESPA § 8(b) prohibition of unearned fees, allows for two types of violations: first, where a settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, 2001 SOP, 66 Fed. Reg. at 53057; and second, where the fee charged is in excess of the reasonable value of goods or facilities provided or the services actually performed. It is this second part of the 2001 SOP which is analogous to YSP analysis, but Busby brings a claim under the first. Busby does not argue that the ABC Fee is unreasonable; rather, she contends that no services were provided for the ABC Fee. At oral argument, Busby explicitly stated several times that if RealtySouth proves that it provided any service in exchange for the $149 ABC Fee, Busby's claim will fail. Thus, the district court will not need to make any reasonableness determinations akin to those in an overcharge case. Rather, a simple binary determination of "any services" or "no services" is all that need be done.

*Busby*, 513 F.3d at 1324 (11th Cir. 2008) (emphasis added).

Later in addressing an arguable defense to liability under § 8(c)(2), the *Busby* court stated:

> Regardless, we need not reach the question. Even if § 8(c)(2) provides some sort of defense to claims under § 8(b), the result is still the same because under either § 8(b) or § 8(c)(2), the issue is whether any services were provided for the ABC Fee. Therefore, the Court concludes that § 8(c)(2) of RESPA does not require any individualized analysis.

513 F.3d at 1327 (emphasis added).

Against this backdrop, Busby seeks partial summary judgment on the issue of RealtySouth's liability under § 8(b) because it contends that "RealtySouth has failed to produce any 'factual' evidence on the sole legal question remaining in this case: i.e., whether RealtySouth 'provided (and thereby earned payment for) specific services in exchange for charging the ABC Fee to its customers." (Doc. 152 at 15 (quoting in part Doc. 124 at 14)).  In particular, Busby maintains that "the so-called 'array of services' defense simply cannot exist under either the plain text of RESPA, or under the strict guidelines set forth by the Eleventh Circuit."  (Doc. 133 at 11 (citing Doc. 124 at 12-13 n.4)).

RealtySouth counters that § 8(b) of  RESPA allows for an array of services defense, that a specific service need not be linked to the ABC Fee, that it is entitled to summary judgment because it has factually established the providing of an array of services in exchange for the ABC Fee, and that "at a minimum, the current factual record and law demonstrate that Busby's Motion should be denied."  (Doc. 148 at 1). RealtySouth alternatively urges that it is entitled to summary judgment because Busby cannot show that the ABC Fee was split with another third party.  (Doc. 148 at 49-50).[10]

---

[10]  The court analyzes this alternative ground *infra*, at n.16.

## 2. Is the ABC Fee an earned settlement item for the purposes of § 8(b)?

The central legal question that this court must resolve on summary judgment is whether the ABC Fee, as an array of services charge, can constitute an earned settlement item for the purposes of § 8(b). Based upon the parties' briefing and this court's own independent research, the Eleventh Circuit has never directly spoken to the validity of this type of defense in response to a § 8(b) claim of no services provided in a published opinion; nor apparently has any other circuit court.[11]

RealtySouth has described the ABC Fee in several different ways. One definition is that it is an amount charged to a borrower as an increase in the price for brokerage services generally (as opposed to a specific identifiable service or group of services). Another explanation is that it accounts for RealtySouth's costs associated with regulatory compliance.

A third description is that it helps defray significant increases in overhead incurred by RealtySouth in the past and presently. A fourth is that it is one

---

[11] The court is not aware of any unpublished circuit court opinions addressing this topic either. Of course, this court is familiar with *Culpepper IV*, 491 F.3d at 1273, which addresses array of services in the context of a claim that a yield spread premium ("YSP") violated § 8(a) of RESPA. *See Culpepper IV*, 491 F.3d at 1273 ("In undertaking this [*i.e.*, array of services] analysis, we do not ask whether the services the broker performed were linked to the YSP in particular; rather, we look at "all of the services performed and [ ] evaluate them in light of all the compensation (not just the YSP in isolation) the mortgage broker received from any source.") (emphasis added) (citations and internal quotations omitted).

component of the collective costs a buyer (or seller) incurs to do business with RealtySouth (with the other piece being the percentage commission charge that is split with the real estate agent).

A fifth is that it relates to RealtySouth's costs attributable to providing facilities, offices, equipment, a far more functional and enhanced web-site and other technological departments, greater availability of information along with a better ability to search for and access such information, and contracts and other business forms for its agents and customers.  A sixth suggestion relating to Busby specifically is that the ABC Fee (at least in part) is connected to the time spent in locating and buying the house that Busby desired to purchased.

Based upon an extension of the reasoning set forth in *Cohen v. J.P. Morgan Chase & Co.*, No. CV-04-4098 (CPS), 2009 WL 212159 (E.D.N.Y. Jan. 28, 2009), the court concludes as a matter of law that the array of services defense for the type of items described by RealtySouth is not a valid counter to Busby's § 8(b) no services claim.[12]  As discussed in more detail below, because the services listed by RealtySouth (and regardless of whether they were actually provided)[13] are not settlement-related and/or provide little or no benefit to the borrower, they cannot

---

[12]  Cited by Busby in her reply.  (Doc. 152 at 14).

[13]  To be clear, this means the court does not need to reach the parties' rather thorny dispute over whether the services listed by RealtySouth as ABC fee-related were in fact provided.

defeat a § 8(b) no services claim.

In *Cohen*, the court was faced with a motion for summary judgment filed by the defendant mortgagee only.  One of the issues addressed was whether the post-closing review[14] provided by Chase and paid for by the borrower at the closing was "an unearned fee even though work may have actually been performed."  2009 WL 212159, at *11.  The court ultimately concluded that "the post-closing review provided by Chase was not a valid settlement service" and denied summary judgment to Chase on this claim because "no compensable settlement services were performed."  *Id.*, at *16.

In reaching this conclusion, the *Cohen* court underwent the following helpful analysis:

> Section 8(b) prohibits the charging of a settlement service fee "other than for services actually performed."  At issue is the meaning of the term "services."  The term on its face applies to any and all services.  However, the term must be interpreted in context. "Statutory construction . . . is a holistic endeavor.  A provision that may seem

---

[14]  Chase explained that the post-closing fee covered the following services:

> [R]eviewing the documents received from the settlement agent to ensure that the agent followed the Chase closing instructions and that the file is complete, correcting mistakes in the documents, retrieving missing documents, combining the closing documents with the existing underwriting file in an organized fashion, sending that file to the National Post Closing center ("NPC"), and thereafter forwarding any late-arriving documents to NPC.

2009 WL 212159, at *1.

ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) (quoted in *ACLU v. DOD*, 2008 U.S. App. LEXIS 20074 *26 (2d Cir. 2008). Such clarification occurs when "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.* The use of the word 'services' in the context of the text makes clear that the only services referred to here are settlement services. If the word 'services' were read to include all services, a settlement service provider would need only to provide a service-of any kind-in order to justify its charging of a fee for settlement service. Congress could not have intended this result.

HUD has, moreover, interpreted the statu[t]e to require that the services performed be settlement services. In its 2001 Policy Statement, HUD interpreted Section 8(b) to prohibit payments that are unearned fees for settlement services, which can occur in cases where "one settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of . . . the services actually performed." 66 Fed. Reg. at 53057. Following this interpretation, HUD makes clear that the "services actually performed" must be settlement services. In its Settlement Costs Booklet for consumers, quoted in the Policy Statement, HUD states that "[i]t is also illegal for anyone to accept a fee or part of a fee for services if that person has not actually performed settlement services for the fee." 62 Fed. Reg. 31982, 31998 (June 11, 1997), quoted in 66 Fed. Reg. at 53058.

Section 8(b) thus requires that no fee may be charged for the rendering of a real estate settlement service other than for settlement services actually performed.

*Cohen*, 2009 WL 212159, at *12 (emphasis added).

Next, the *Cohen* court addressed whether "Chase's post-closing services [we]re settlement services[.]" *Id.* (emphasis in original omitted). After looking at RESPA's

statutory definition of settlement services, *see supra* at 12, the court turned to further

direction from HUD and *Black's Law Dictionary*.

> In Regulation X, HUD's implementing regulation for RESPA, HUD has defined the term "settlement" in the following manner:
>
> > Settlement means the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan. This process may also be called "closing" or "escrow" in different jurisdictions.
>
> 24 C.F.R. § 3500.2. Similarly, Black's law dictionary defines a "closing," also known as "settlement," as
>
> > the final meeting between the parties to a transaction, at which the transaction is consummated; esp., in real estate, the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred.
>
> Black's Law Dictionary (8th ed. 2004).

*Cohen*, 2009 WL 212159, at *13.

> Against this definitional backdrop, the court went on to conduct a "temporal

analysis" of the services provided by Chase explaining that:

> > Post-closing services do not fit within the definition of settlement services under the preceding definitions of settlement. They are not akin to any of the particular services listed in the statute, nor do they fall within the catch-all phrase including "handling of the processing and closing of settlement." As the definitions of 'settlement' make clear, the closing of settlement is complete at the time when the property is transferred. Post-closing review takes place after this time. <u>Under a temporal analysis, in which the status of a service as a settlement service</u>

is determined by its timing relative to settlement, post-closing review is not a settlement service. *See McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 589-90 (E.D.N.Y.2005) (applying "temporal analysis" to determine what constitutes a settlement service under RESPA).

To support its claim that 'post-closing services' are compensable under RESPA, defendant argues that the fact that these activities take place after the closing is not a bar to charging a settlement fee for them. Defendant points to Regulation X and HUD's sample forms, which state that lenders may charge borrowers at closing for premiums covering various forms of insurance to be provided after closing. D. Mem. at 14. In particular, defendant cites HUD's explanation of settlement costs listed in Section 900 of the HUD-1 disclosure form. The explanation states: "[y]ou may be required to prepay certain items at the time of settlement, such as accrued interest, mortgage insurance premiums, and hazard insurance premiums." HUD, Your Settlement Costs, available at http://www.hud.gov/offices/adm/hudclips/forms/files/1.pdf, Levine Decl. Ex. 5. However, defendant did not include the post-closing fee in Section 900 of the HUD-1 settlement form provided for insurance premiums and other "Items Required By Lender to be Paid in Advance." Plaintiff's Ex. 2. Instead, the post-closing fee is hand written in Section 800, "Items Payable in Connection with Loan." *Id.* HUD explains this section as follows: "[t]hese are the fees that lenders charge to process, approve, and make the mortgage loan." HUD, Your Settlement Costs. The post-closing fee was not charged as a 'prepayment' of an item that would be provided to the borrower after settlement, but instead as an item payable in connection with processing, approving, and making of the loan. However, the post-closing review was not done in connection with the making of a loan, but was instead a post-settlement activity. Defendant's comparison of post-closing review to prepaid insurance premiums does not withstand scrutiny.

*Cohen*, 2009 WL 212159, at *13 (emphasis added) (footnotes omitted).

The *Cohen* court then proceeded with a "benefit analysis" as follows:

In addition to arguing that the post-closing review is not a valid

settlement service due to its timing, plaintiff suggests that the review is not a settlement service because it does not "benefit the consumer." P. Opp. at 24. Defendant argues that the fact that the post-closing review does not benefit the borrower "lacks any foundation in RESPA." D. Mem. at 15. Defendant states that nothing in the text of § 8(b) prohibits a lender from charging a borrower for services that benefit only the lender, and furthermore points to clauses in RESPA and in Regulation X that authorize lenders to charge borrowers for services, such as title examination and title insurance, that protect only the lender's interest in the real-estate collateral. *Id.* at 16.

> The suggestion that RESPA is devoid of the idea that settlement services must benefit borrowers is in conflict with the legislative history of the statute, which indicates that Congress was indeed concerned about services benefitting consumers. The Senate Report states that in the case of unearned fees, "the payment or thing of value furnished by the person to whom the settlement business is referred tends to increase the cost of settlement services *without providing any benefits* to the home buyer." Senate Report at *6551 (quoted in *Cohen I*, 498 F.3d at 123) (emphasis added). Although the statute does not state that a service must be directly beneficial to the borrower in order to be compensable, the issue of benefits was clearly of concern to the Senate. In addition, leading cases addressing RESPA have evaluated the fees at least in part based on the benefits conferred to borrowers. *See Sosa*, 348 F.3d at 981 and 984 (explaining that the statute prohibits fees that increase settlement costs without providing benefits and finding that defendant's fee did benefit consumers and therefore was permissible); *Culpepper*, 491 F.3d at 1273 (compensation was not unreasonable where a mortgage broker benefitted borrowers in their mortgage transactions); *but see In re Merscorp*, 2008 U.S. Dist. LEXIS 40473 at *40-*41 (finding that because the text of § 8(b) does not require that there be a benefit to the borrower, it is clear that no benefit is required).

*Cohen*, 2009 WL 212159, at *13-14 (emphasis by underlining added).

In finding Chase's opposition to the benefit analysis unpersuasive, the *Cohen*

court reasoned:

> In support of its claim that settlement services need not benefit borrowers, defendant relies on a definition of 'benefit' developed by HUD to support its 'total compensation for total services' approach to Yield Spread Premiums.  In its explanation of its YSP framework in its 1999 Policy Statement, HUD states that "[a]ll services, goods and facilities insure [sic] to the benefit of both the borrower and the lender in the sense that they make the loan transaction possible . . .  The consumer is ultimately purchasing the total loan and is ultimately paying for all the services needed to create the loan."  64 Fed. Reg. at 10086.  However, defendant glosses over the word "create."  During the time when the loan transaction is being put together and approved, the question of who benefits from a particular service cannot be determined since all services work together to realize the loan transaction. However, once the loan is created, that difficulty disappears. Chase's post-closing review of documents is not part of the loan creation process. It is a separate process performed to ensure that Chase can enforce the loan or sell it to investors.  Ward Decl. [¶¶ 11, 14, 15. The benefits clearly accrue to Chase and not to the individual borrower who is charged the fee.

> In further support of its claim, defendant cites *Kruse*, in which the Second Circuit held that RESPA did not prohibit as an overcharge compensation for the underwriting service analysis of the borrower's ability to repay the loan in order to determine if it would be purchased by Fannie Mae or Freddie Mac on the secondary mortgage market.  383 F.3d at 53.  Defendant argues that if RESPA had required that services be for the benefit of the borrower in order to be valid settlement services, the Court would have found the fee to be illegal rather than permitting it. However, the facts of *Kruse* are distinguishable. The underwriting service performed in that case took place prior to closing, and thus was part of the process of making the loan.  Applying HUD's benefits analysis, the borrower benefitted from that service.  <u>In contrast, because post-closing review does not benefit the borrower in the creation of her particular loan, it is not a settlement service.</u>

*Cohen*, 2009 WL 212159, at *14-15 (emphasis by underlining added) (footnote omitted).

The *Cohen* court then provided a working definition for the term "settlement service" based in part upon Eleventh Circuit law:

> Based on the foregoing, <u>a working definition of what constitutes a 'settlement service' is that which either directly benefits the consumer, or is performed at or before the closing</u>. This accounts for actions taken by the lender before closing that for the most part benefit the lender, such as underwriting, credit reports, and appraisals, for which RESPA clearly permits fees to be charged. It also accounts for actions performed after closing that are deemed compensable by HUD, such as in the case of prepaid insurance premiums, which are clearly beneficial to the borrowers who pay for them. This formulation ensures that the services performed and paid for by individual borrowers are all tied to the creation of an individual loan.

> An example of this approach appears in *Friedman v. Market Street Corp.*, 520 F.3d 1289 (11th Cir. 2008) ("*Friedman II*"), which defendant cites for the proposition that fees for services performed after closing are permissible. In *Friedman*, plaintiffs paid a one time fee of $556.25 in order to have the right to make tax, insurance, and other payments associated with their property directly, rather than having to put money into an escrow account held by the bank. The Court explained that "<u>[t]he benefit to borrowers who choose a non-escrowed loan</u> is that the borrowers retain control over the monies that would otherwise be paid into escrow until such time as they make the payments directly." *Id.* at 1291. While it is not clear that the services provided were in fact compensable settlement services, <u>the Court's specific statement of consumer benefit offers a model of analyzing instances where settlement fees are charged for services performed after settlement</u>.

*Cohen*, 2009 WL 212159, at *15 (emphasis added) (footnote omitted).

As the *Cohen* court finally concluded:

> There is no serious dispute that post-closing review was performed on plaintiff's loan, and that Chase believed that this review was necessary work ("not sham services" as defense counsel put it at oral argument). The question of whether the post-closing fee was actually compensation for this review is an open one, as discussed previously. However, the more pertinent question is whether, under the statute, Chase can allocate its overhead costs to a particular mortgage. That Chase refers to its post-closing work as "post-closing services" does not transform this work into a settlement service. Chase admits that it charges this fee for work that Chase performs after the closing to ensure the salability of the loan on the secondary mortgage market. Chase argues that services need not be for the benefit of the borrower nor need they occur before the loan closing in order to qualify as settlement services. Chase further maintains that ensuring the salability of these loans makes it possible for banks to issue greater numbers of mortgages, which is a benefit to borrowers. This is too tenuous a connection. If this argument were enough to qualify an action as a settlement service, Chase could begin charging its borrowers for overhead costs related to the provision of mortgages, such as the cost of audits, training, and updating management information systems (all of which are recommended for banks by the *Comptroller's Handbook*, which also recommends performing post-closing review of loans).

*Cohen*, 2009 WL 212159, at *15 (emphasis added).

Here, this court evaluates the items covered by the ABC Fee as comparable to the post-closing services analyzed under the working definition of settlement services developed in the *Cohen* case. The court is persuaded that this practical approach to assessing whether items charged to a borrower are RESPA-compensable (*i.e.*, earned) is appropriate, especially in light of the Eleventh Circuit's discussion of § 8(b) claims

28

not only in this case, but also in *Sosa* and *Friedman II*, *supra*, both of which expressly acknowledge a benefit to borrower component to the equation.

More specifically, the array of services listed by RealtySouth that it contends are related to the ABC Fee are not settlement services because either temporally they do not occur "at or before the closing" and, any direct benefit to the borrower is non-existent or negligible. For example, RealtySouth suggests that the ABC Fee finances in part the costs associated with improved technological and informational services for its agents and customers. However, there is no indication, much less any evidence, establishing how a customer's ability to access an enhanced website is part of or in furtherance of the loan closing process or how it benefits the borrower as part of the real estate settlement. (*See also* Doc. 124 at 12-13 n.4 (explaining that to the extent the ABC Fee relates to new services to be provided by RealtySouth, such future items cannot be "earned" for the purposes of § 8(b)).

Similarly, to the extent that the ABC Fee goes to pay for RealtySouth's past and future increases in overhead, including regulatory compliance costs and other general administrative expenses, such variables fall outside the parameters of a loan settlement and, substantively, the borrower receives no benefit.

Finally, with respect to the Busby transaction, RealtySouth maintains that the ABC Fee in part covers the help that Busby received from its agent in locating and

29

buying the house that she purchased.  Assuming that this service properly falls within a settlement item compensable under RESPA, RealtySouth admittedly has a separate pricing component for those funds that it splits with its sales agents, *i.e.*, the percentage commission charge, specifically for those real estate services provided by an agent, and, in the Busby transaction, the HUD-1[15] shows that the sellers paid a five percent commission (based on the contract sales price of the house) split evenly between RealtySouth and its agents.  (Doc. 1 at HUD-1 at 2 at § L at line items 701-702).  Therefore, the court struggles to see how charging Busby for helping her to find a house would not be a duplication (and thus unearned) of those percentage commission charges already accounted for on the HUD-1.  (*See also* Doc. 1 ¶ 25 ("The ABC Fee was charged in addition to the 'Total Sales/Brokers Commission' of $9350 represented on Plaintiff's HUD 1 Settlement Statement.")).

Separate and apart from the above settlement service analysis under the *Cohen* framework, the court finds further support for refusing to accept RealtySouth's position that the ABC Fee can ever be earned in its prior decision to preclude Murray's testimony as an expert.  In particular, the court still has difficulty accepting RealtySouth's proposition that a closing charge attributable to an ill-defined or non-

---

[15] "The Housing and Urban Development-1 ('HUD-1') statement is a settlement form used in closing a property sale; it details the costs and fees associated with a mortgage loan." *Busby*, 513 F.3d at 1319 n.2 (citations omitted).

specific set of services (or alternatively to <u>all</u> services) could ever be legally sufficient to defeat a § 8(b) no services provided claim.  As this court stated previously, "the so-called 'array of services' defense would seem to eviscerate the potential for any § 8(b) RESPA no services provided in exchange for fee claim (like Busby has asserted here) because a service provider could always defend against liability by tying an extra fee to the overall body of services already provided and charged for as itemized on the settlement statement when that extra fee really had no direct underlying basis for being <u>separately</u> listed as an <u>earned</u> item." (Doc. 124 at 12 n.4).

This incongruous result would be entirely inconsistent with RESPA's consumer-protection purpose as expressed by Congress. *See also Cohen*, 2009 WL 212159, at *12 ("If the word 'services' were read to include all services, a settlement service provider would need only to provide a service-of any kind-in order to justify its charging of a fee for settlement service.  Congress could not have intended this result.").

Furthermore, this court has been unable to locate a post-*Sosa* case[16] within the

---

[16] For example, RealtySouth attaches the pre-*Sosa* case of *Preston v. St. Joe Co.*, Case No. 98-2443-Civ-T-24(B), (M.D. Fla. Sept. 30, 1999), in support of its proposition that regardless of whether a specific service was provided in exchange for the ABC Fee, "Busby's claim [still] fails as a matter of law because the undisputed evidence shows that the ABC was not split with any third party." (Doc. 148 at Ex. A; *id.* at 49 (emphasis omitted)).  In making this argument, RealtySouth states that while *Sosa* lends support to the position that "fees do not have to be split or divided to violate Section 8(b)" *Friedman II* "question[s] 'whether the language in *Sosa* is controlling or is dicta,' but d[oes] not decide the question." (Doc. 148 at 49).  RealtySouth then cites to other circuits

Eleventh Circuit in which a § 8(b) no services claim was successfully defended in the

absence of at least some specific service linked to the charge.  *See, e.g., Friedman II,*

520 F.3d at 1292 (summarizing prior unpublished panel decision affirming "the

district court's judgment because 'the only allegation in the Friedmans' complaint is

that Market Street rendered no services in exchange for the fee, and it is clear from

the pleadings that some services were contemplated in exchange for the fee, such as

monitoring the payment of taxes and insurance'") (citing *Friedman v. Market Street*

*Mortgage Corp.* (*Friedman I*), No. 03-14370, slip op. at 3, 107 Fed. Appx. 888 (11th

Cir. 2004)); *Friedman II,* 520 F.3d at 1295 ("All of this was before the *Friedman I*

panel, and the panel duly concluded that 'it is clear from the pleadings that some

---

that have held that "Section 8(b) cannot be violated unless the fee or charge has been improperly split or shared with a third party."  (Doc. 148 at 50 (citations omitted)).

To be more precise in summarizing the case's procedural history, the *Friedman II* court noted that in *Friedman I,* the  "panel declined to decide whether the language in *Sosa* is controlling or is dicta." 520 F.3d at 1292.  Accordingly, any statement made in *Friedman I* (or *Friedman II* for that matter) about *Sosa* is itself merely dicta.  Moreover, even if *Friedman I* had reached the controlling/dicta posited issue, it could not validly overrule *Sosa* not only because of the prior panel rule, but also because an unpublished panel decision, at best, is only persuasive authority.

In any event, the court agrees with Busby that "*Sosa* is still the law" in the Eleventh Circuit and that a "disputed fee need not be 'split' in order for [§ 8(b) of] RESPA to be violated."  (Doc. 152 at 26 (emphasis omitted)).  Moreover, the holding in *Sosa* is also consistent with HUD's Statement of Policy.  *See* Statement of Policy 2001-1 § IV, Pt. C § D, 66 Fed. Reg. at 53,059 ("In HUD's view, Section 8(b) forbids the paying or accepting of any portion or percentage of a settlement service--including up to 100%--that is unearned, whether the entire charge is divided or split among more than one person or entity or is retained by a single person.") (emphasis added).  Accordingly, the court denies RealtySouth's Cross-Motion as to this alternative basis.

32

services were contemplated in exchange for the fee, such as monitoring the payment of taxes and insurance.'").

Here, any service attributable to the ABC Fee (as opposed to the escrow waiver fee at issue in *Friedman I* and *Friedman II*) is much more amorphous, is a moving target, and/or is individualized.   (*See, e.g.*, Doc. 148 at Dodge Aff. ¶ 5 ("[T]he administrative brokerage commission is simply an increase in the price or fee that RealtySouth charges for all its brokerage services <u>rendered to most buyers and sellers</u>.") (emphasis added); *id.* (ending description of services relating to ABC Fee with "<u>just to name a few</u>") (emphasis added); *id.* (indicating that helping Busby to locate home for purchase is individualized service provided in exchange for the ABC Fee <u>particular to the Busby transaction</u>); Doc. 1 at HUD-1 at 2 at § L at line item 704 (listing "ABC Fee to Realty South" without any further description other than as a subset of line item 700 for "**Total Sales/Broker's Commission**"); Doc. 144 at Ex. C at 1 ¶ 5 ("**BROKER COMPENSATION**:  Client agrees to pay RealtySouth an administrative brokerage commission of $149 upon closing and, for services on the buy-side of the transaction, a commission based on the type of property purchased by Client as follows: . . ."))[.17]

---

[17]  Accordingly, the court disagrees with RealtySouth that *Friedman II* requires a ruling on its favor on summary judgment.  (*See* Doc. 148 at 24).

### 3.    Alternatively, law of the case requires a rejection of RealtySouth's array of services defense.[18]

Accepting RealtySouth's array of services defense would similarly be at odds with the Eleventh Circuit's direction regarding the scope of how <u>this</u> court is to approach the viability of Busby's § 8(b) claim in <u>this</u> case: "<u>[A] simple binary determination of 'any services' or 'no services' is all that need be done</u>." *Busby*, 513 F.3d at 1324 (emphasis added); (*see also* Doc. 124 at 12 n.4 ("[T]he appellate decision does not expressly use that (or even similar) terminology, much less hint that such a defense [*i.e.*, array of services] is viable.")).  Further, this court finds this omission in the *Busby* mandate even more significant given the Eleventh Circuit's overall familiarity with the array of services concept as analyzed and applied in *Culpepper IV* under § 8(a).  *See, e.g., Culpepper IV*, 491 F.3d at 1273 ("If the answer to the first question is yes, we then proceed to ask whether the total compensation was reasonable <u>in light of the total array of services that the broker performed</u>.") (emphasis added) (citation omitted); *id.* at 1274 ("The Borrowers do not present any evidence demonstrating that these compensation amounts were unreasonable <u>in light of the total array of services performed</u>.") (emphasis added).

Interjecting an array of services or additional fee for all services defense into

---

[18]  For principles governing the application of the law case doctrine, see Doc. 101 at 11-12,14.

the mix transforms the § 8(b) assessment well beyond a simple choice between two alternatives as mandated by the Eleventh Circuit.  Moreover, the *Busby* mandate makes it clear that § 8(b) no services claims <u>do not mirror</u> § 8(a) YSP claims:

> The district court concluded that like YSP cases, the required test for whether the payment "violates RESPA turns on whether the total compensation received (here by RealtySouth in the form of the ABC Fee from Busby and the 2.5% commission from [the seller]) would be commensurate with the services provided in the transaction."  Because the district court concluded it would be required to perform an individualized analysis like the analysis in YSP cases in order to make this comparison, the district court found the case unfit for class treatment for the same reasons it is inappropriate in YSP cases.

> <u>We conclude that the district court applied the wrong legal standard by analyzing Busby's claim under YSP logic</u>.  As stated above, the 2001 SOP, addressing RESPA § 8(b) prohibition of unearned fees, allows for two types of violations: <u>first, where a settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done</u>, 2001 SOP, 66 Fed. Reg. at 53057; and second, where the fee charged is in excess of the reasonable value of goods or facilities provided or the services actually performed. <u>It is this second part of the 2001 SOP which is analogous to YSP analysis, but Busby brings a claim under the first. Busby does not argue that the ABC Fee is unreasonable; rather, she contends that no services were provided for the ABC Fee.</u>

513 F.3d at 1324 (emphasis added).

Further evidence of the Eleventh Circuit's rejection of applying YSP logic to Busby's claim appears in its discussion of the superiority element:

> In addressing the superiority element of its Rule 23(b)(3) analysis, the district court without explanation simply stated: The "Court acknowledges <u>the necessity of individualized analysis pertaining to the</u>

reasonableness of the compensation received by RealtySouth, coupled with the existence of numerous individual defenses under the estoppel doctrine.  These issues make individual suits or claims, not class suits, the superior way to resolve this dispute."

RealtySouth argues that the district court's superiority ruling was correct because some of its customers, including Busby, negotiated a lower percentage commission in exchange for their agreement to pay the ABC Fee.  According to RealtySouth, the district court correctly determined that individual suits are the superior method of resolving this case because these customers' lower, negotiated commissions give RealtySouth individualized estoppel defenses against such customers.  We disagree. . . .

[I]f the ABC Fee was in fact a violation of RESPA § 8(b), RealtySouth is not entitled to a defense of equitable estoppel.

*Busby*, 513 F.3d at 1326 (emphasis added).

Accordingly, the overall reasonableness of the brokerage fees paid by Busby (*i.e.*, YSP logic), even as a result of her own negotiations involving the ABC Fee, has no impact on her ability to pursue her § 8(b) no services provided claim.  Similarly, RealtySouth's defense that the ABC Fee is simply a pricing component for the overall body of broker fees (which Busby acknowledged and agreed to pay) is foreclosed by the *Busby* mandate.  (*See, e.g.*, Doc. 148 at 23 "Busby testified under oath that she understood that 'Broker Compensation' meant the 'money that the broker receives for its services.'  That should end the matter.") (internal citation omitted)).

HUD's Statement of Policy relating to mortgage broker fees and YSPs in its

discussion of § 8 also lends support to this conclusion.  *See generally* Statement of Policy 2001-1 § IV, Pt. A, 66 Fed. Reg. at 53,053-056.  In particular, HUD explains that "the second part of [its] test [19] requires that total compensation to the mortgage broker be reasonably related to <u>the total set of goods or facilities actually furnished or services performed</u>."  *Id.* at 53,055 § 2; *see also id.* ("Total compensation to the broker must be reasonably related to the total value of goods or facilities provided or services performed by the broker.").

In contrast, HUD's Statement of Policy regarding § 8(b) claims uses no "total set," "array of services," or other similar language in its clarification <u>of the meaning of no services provided as an unearned fee</u>.  *See generally* Statement of Policy 2001-1 § IV, Pt. C § D, 66 Fed. Reg. at 53,058-59.  Thus, HUD's Statement of Policy confirms that "array of services" is a YSP/overall reasonable mortgage broker fees concept and relatedly (by omission) that it has no basis for application in the context of a claim of <u>no services provided under § 8(b)</u>.  Therefore, the court alternatively rules that the law of case doctrine implicitly requires it to deny RealtySouth's array of services defense to Busby's § 8(b) claim because allowing it to proceed to trial would once again incorrectly apply "YSP logic" to a no services provided § 8(b)

---

[19]  For "determining whether lender payments to mortgage brokers are legal under RESPA."  *See* Statement of Policy 2001-1 § IV, Pt. A, 66 Fed. Reg. at 53,054.

RESPA violation.

In sum, the court determines that the ABC Fee is unearned because as defined by RealtySouth it really represents a price and/or cost allocation measure as opposed to a RESPA-compensable settlement service.  Alternatively, the court holds that the law of the case doctrine mandates a rejection of RealtySouth's array of services defense as a matter of law.  Accordingly, for these alternative and independent grounds, Busby's Partial Motion is due to be granted, RealtySouth's Cross-Motion is due to be denied, and judgment as to RealtySouth's § 8(b) liability is due to be entered in favor of Busby and the class that she is representing.

## IV.   Strike Motion

In the Strike Motion, Busby seeks to strike the declaration of Murray (Doc. 146) offered in support of RealtySouth's Cross-Motion on the basis that it "simply repeats the same proffered testimony which this Court [Doc. 124] has already determined to be irrelevant." (Doc. 153 at 3).  Because on reconsideration this court has confirmed its order precluding Murray from testifying as an expert witness and also has granted Busby's Partial Motion and denied RealtySouth's Cross-Motion without reference to Murray's testimony, the Strike Motion is due to be termed as moot.

## V.     Conclusion

Realty South's Second Reconsideration Motion does not meet the standard applicable to such motions and therefore is due to be denied.  Alternatively, the Second Reconsideration Motion is due to be granted in part (in that the court has reconsidered its order) and otherwise is due to be denied (because the court declines to withdraw its order precluding Murray from testifying as requested by RealtySouth).  Relatedly, the court denies RealtySouth's request for a hearing on its Second Reconsideration Motion.

Busby's Partial Motion is due to be granted and RealtySouth's Cross-Motion is due to be denied because the ABC Fee is unearned in the context of a § 8(b) no services provided claim under RESPA.  Alternatively, the law of the case doctrine requires the court to reject RealtySouth's array of services defense.

Further, RealtySouth's Cross-Motion is also due to be denied as to its alternative request that this court overrule *Sosa* on the issue of fee-splitting as explained, *supra*, at n.16.  Finally, Busby's Strike Motion is due to be termed as moot.

A separate order will be entered.

**DONE** and **ORDERED** this the 20th day of April, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

39